UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,
and the COMMONWEALTH OF
VIRGINIA *ex rel.* KATHERINE
HAGOOD and JODI COTNER,

      Relator-Plaintiffs,

v.                                          Civil Action No: 4:11cv109

RIVERSIDE HEALTHCARE
ASSOCIATION, INC., ET AL.,

      Defendants.

### OPINION AND ORDER

This matter is before the Court on a Motion to Dismiss, ECF No. 48, filed on January 9, 2015 by Riverside Healthcare Association, Inc. ("Riverside Healthcare"), Riverside Hospital, Inc. ("Riverside Hospital"), Riverside Physician Services, Inc. ("RPS"), and Riverside Medical Equipment Company, Inc. ("RMEC" and, collectively with Riverside Healthcare, Riverside Hospital, and RPS, "Defendants"). After examining the briefs and the record, the Court determines that oral argument is unnecessary because the facts and legal contentions are adequately presented and oral argument would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. R. 7(J).

# I. FACTUAL AND PROCEDURAL HISTORY[1]

## A. Factual Background

### 1. The Parties

Katherine Hagood ("Hagood") and Jodi Cotner ("Cotner," and collectively with Hagood, "Relators"), on behalf of the United States and Commonwealth of Virginia, have brought this qui tam action against Defendants pursuant to the False Claims Act ("FCA") and Virginia Fraud Against Taxpayers Act ("VFATA"). Defendants are healthcare providers. More specifically, Riverside Hospital is a non-profit hospital located in Newport News, Virginia, and incorporated under Virginia law. First Am. Compl. ¶ 10, ECF No. 12. RPS is a non-profit corporation that engages in the business of providing healthcare. Id. ¶ 11. Like Riverside Hospital, it is located in Newport News. Id. RMEC is a division of RPS that is responsible for billing physician services. Id. ¶ 12. Riverside Healthcare operates Riverside Hospital, RPS, and RMEC, which are Riverside

---

[1] The facts of this case, drawn from the First Amended Complaint, are assumed true for the purpose of deciding the motion currently before the Court. See Burbach Broadcasting Co. of Del. v. Elkins Radio Corp., 278 F. 3d 401, 406 (4th Cir. 2002). The facts recited here are not to be considered factual findings for any purpose other than consideration of the pending motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (observing that, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint"); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) ("[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint.").

Healthcare's wholly-owned subsidiaries. Id. ¶ 13. According to Relators, Defendants "have common ownership and a common management structure," such that the managing officers of Riverside Hospital, RPS, and RMEC "report and answer directly to executives of RHA." Id.

Relators are private citizens who have brought this action on behalf of the United States and Commonwealth of Virginia. Id. ¶ 15. Hagood is a United States citizen and resident of Virginia. Id. Defendants formerly employed Hagood as an emergency room administrator. Id. In such position, Hagood supervised "the billing of services in Riverside's Emergency Department." Id. Cotner is a United States citizen and resident of Texas. Id. ¶ 16. Like Hagood, she was formerly Defendants' employee. Id. In such capacity, she served as a registered nurse and Director of the Emergency Department. Id. "Areas under her responsibility included treatment and billing of patients in Riverside's Emergency Department." Id.

Relators allege that Defendants submitted false claims, in violation of the FCA and VFATA, to the federal Medicare, Medicaid, CHAMPUS, FAMIS, federal employee and veteran healthcare programs and Virginia Medicaid, FAMIS, and SANE programs (collectively "Government Payors"). See id. ¶ 3. More specifically, Relators allege that Defendants submitted false claims to Government Payors for: 1) services not rendered; 2)

3

pharmaceuticals not administered; 3) "upcoded" services;[2] and 4) services provided by unqualified personnel. Id. ¶ 19. In addition, Relators allege that Defendants terminated Hagood in retaliation for her opposition to Defendants' purported fraudulent billing practices. Id. ¶¶ 41-44.

### 2. False Claims

#### a. Counts I and V: Services Not Performed

First, Relators allege, in Counts I and V, that Defendants violated the FCA and VFATA by billing Government Payors for services that were not actually performed. Id. ¶¶ 19, 45-49, 65-69. According to Relators, Defendants frequently billed the Government for four types of services that were not actually performed: intubations; tracheostomies; medication pathways; and electrocardiograms ("EKGs").

Regarding intubations, Relators allege that Defendants' billing software program, IBEX, contained systemic flaws, id. ¶ 23, that "rendered the billing system prone to erroneous entry and/or inability to correct erroneous keystrokes, such that double and, in some instances, triple intubation charges were levied against" Government Payors, id. ¶ 24. In support of such allegation Relators submitted a table of individuals allegedly

---

[2] "'Upcoding,' a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." United States ex rel. Bledsoe v. Community Health Sys., Inc., 342 F.3d 634, 637 n.2 (6th Cir. 2003) (citation omitted).

overcharged for intubations.  Id.  The table includes the patient account number, patient name, service item code and name, date of service, and alleged extent of improper charges assessed by Defendants with respect to one-hundred five intubation procedures.  Id.  The dates of service for the procedures listed in the table range from August 11, 2005 to May 8, 2006.  See id.  Relators assert that twenty to thirty percent of the patients listed in such table were covered by a Government Payor program because Government Payors served at least twenty to thirty percent of Riverside's patient base.  See id. at 8 n.3.

As to tracheostomies, Relators allege that "the Riverside Emergency Department sometimes billed for procedures believed to be intubation under an internal code that resulted in charges being made" to Government payors for tracheostomies, which are a more expensive procedure.  Id. ¶ 25.  Based on such internal coding, Relators assert that Government Payors paid "$809.66 more for those procedures than should have been paid."  Id.  To support their allegations, Relators submit a table of instances in which Defendants allegedly billed for tracheostomies when, in fact, Defendants' staff performed an intubation or less expensive procedure.  Id.  The table includes information from a seventeen-month period, and, for seventeen tracheostomy procedures, lists the patient account number, patient name,

service item code and name, and date of service.  Id.  The dates
of service range from July 23, 2005 to April 24, 2006.  See id.
Relators assert that at least twenty to thirty percent of the
patients listed in such table were covered by Government Payors.
See id. at 8 n.3.

Relators also allege that Defendants submitted false claims
to Government Payors while billing for medication pathways.  Id.
¶ 26.  In particular, according to Relators, "[t]he IBEX system
was set up to automatically bill for medication 'route' or
'pathway' irrespective of whether this was permitted with
delivery of the medication involved," and this "resulted in
impermissible double charges being levied for 'routes.'"  Id.

Lastly, with respect to false claims for services allegedly
not rendered, Relators allege that Defendants engaged in
impermissible billing practices for EKGs.  Id. ¶ 27.  According
to Relators, Defendants charged for EKGs when no such procedure
was performed, performed and billed for EKGs without a
physician's order, and double-billed for EKGs that were properly
ordered.  Id.

### b. Counts II and VI: Pharmaceuticals Not Administered

As a second theory of FCA and VFATA liability, Relators
allege, in Counts II and VI, that Defendants filed false claims
with Government Payors for pharmaceuticals that they did not
actually administer.  Id. ¶¶ 50-54, 70-74.  According to

6

Relators, flaws in the IBEX system resulted in improper double or triple charges for medications. Id. ¶ 29. Relators allege that such billing errors occurred with multiple different types and classes of medication. Id. In support of such allegations, Relators present a table of charges for one medication, Versed, during one two-month period in 2006. Id. The table details the patient account number, patient name, transaction date, and extent of alleged improper charges for twenty-two administrations of Versed during such period. The transaction dates in such table range from January 1, 2006 to February 25, 2006. See id. As with the prior tables, Relators allege that at least twenty to thirty percent of the patients listed in the table were covered by Government Payors. See id. at 8 n.3.

### c. Counts III and VIII: Upcoding

Third, Relators allege, in Counts III and VIII, that Defendants submitted false claims to Government Payors by upcoding for evaluation and management services ("E/M services"). Id. ¶¶ 55-59, 80-84. For a healthcare provider to bill Medicare for E/M services provided to a patient, the Centers for Medicare & Medicaid Services ("CMS") require the provider to use Current Procedural Terminology ("CPT") codes to identify such services. See generally CMS, Medicare Claims Processing Manual ch. 12, § 30.6 (2014), available at

http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/
Downloads/clm104c12.pdf.    "Code sets used to bill for E/M
services are organized into various categories and levels [and,]
[i]n general, the more complex the visit, the higher level of
code the physician . . . may bill within the appropriate
category."    CMS, <u>Evaluation and Management Services Guide</u> 8
(2014),    <u>available     at</u>     http://www.cms.gov/Outreach-and-
Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/
eval_mgmt_serv_guide-ICN006764.pdf.

According to Relators, Defendants "relied upon IBEX to
calculate each patient's [E/M] acuity level," assigning levels
"between 1-5 or 'Critical Care.'"    First Am. Compl. ¶ 31.    Level
"'1' was the least intensive and least expensive level of care[,
and] [e]ach level thereafter materially increased in acuity and
expense."    <u>Id.</u>    "[V]arious tasks performed by providers were
assigned point values and as more tasks were performed, and
point levels increased as services were consumed '[à] la carte'
as would the patient's acuity level."[3]    <u>Id.</u> ¶ 32.    However, once
a patient was assigned "Critical Care" status, Defendants could
not continue to charge the patient for "à la carte" consumption
of services.    <u>Id.</u>

---

[3] According to Relators, in 2006, Defendants used the following
allocation of points for each acuity level: 1 – 25 points; 2 – 40
points; 3 – 65 points; 4 – 90 points; 5 – 155 points; and Critical
Care – 500 points.  First Am. Compl. ¶ 32.

Relators allege that Defendants submitted false claims to Government Payors through four methods of upcoding. First, Defendants "erroneously assigned 15 points to the administration of oral medications when the actual number should have been 5[,] resulting in a significant increase in charges." Id. ¶ 33. Second, Defendants "continued to charge '[à] la carte' points to critical care patients for various tasks and services when no additional charges should have been applied." Id. Third, "[t]he IBEX system would sometimes double charge [] a patient for whatever acuity level was administered." Id. Fourth, "[i]f a patient left without being seen they would sometimes be charged and receive an acuity level as if they had been seen by a physician or other level of provider that they had not actually seen." Id. To support such allegations, Relators have included a table of patients whom Defendants allegedly billed for a higher level of E/M services than they actually provided in January 2009. See id. Such table includes the patient's name, level charged, alleged actual level of service rendered, and patient account number for fifty-seven patients. Id. Relators allege that such upcoding occurred "well before and continued well after January, 2009." Id. at 16 n.4.

### d. Counts IV and IX: Unqualified Personnel

Finally, with respect to false claims, Relators allege, in Counts IV and IX, that Defendants submitted false claims to

Government Payors by billing for services provided by unqualified personnel. Id. ¶¶ 60-64, 80-84. In particular, Relators allege that Beverly Atkins, a registered nurse and the director of Defendants' Sexual Abuse Nurse Examiner ("SANE") program, performed pediatric SANE examinations even though she did not have the requisite training or certification by the Commonwealth. Id. ¶¶ 35-36. According to Relators, Defendants submitted false claims to Government Payors by billing for Atkins' SANE examinations despite her lack of certification. Id.

### 3. Count IX: Wrongful Termination

In Count IX, Relators allege that Defendants violated the FCA by terminating Hagood because she objected to Defendants' alleged fraudulent billing practices. Id. ¶¶ 85-87. Relators allege that Hagood informed Defendants that she considered certain billing practices to be unlawful. Id. ¶ 42. According to Relators, even though Hagood was "performing well on all objective measures of employment performance," Defendants terminated Hagood "shortly after" she complained about Defendants' billing practices. Id. ¶ 43. Relators allege that Defendants terminated Hagood to intentionally retaliate against her for her complaints about Defendants' billing practices. Id. ¶ 44.

### 4. Defendants' Knowledge of Fraudulent Practices

Relators broadly allege that Defendants knowingly submitted the alleged false claims stated above. With respect to Defendants' knowledge, Relators also allege that a 2006 audit of billing practices gave Defendants' senior managers actual knowledge of the alleged fraudulent billing practices. See id. ¶ 20. According to Relators, the 2006 audit uncovered fraudulent and double billing in excess of $3,500,000. Relators assert that the following members of Defendants' senior management became aware of such allegedly fraudulent practices: "Golden Bethune, CEO; Lisa Salsberry, Director of Internal Audits; Diana Lovechio, Vice President; Gwen Hartzog, Vice President & Chief Nursing Officer; William Downey, CFO[;] [] Rene Roundtree, Vice President Emergency Services[;] and Ricelle Fliescher." Id. Relators also allege that "the senior managers within Riverside responsible for these practices knew about them prior to the audit results being reported." Id. Additionally, Relators assert that they possess emails among Defendants' employees corroborating their allegations regarding: IBEX system errors causing overbilling for medication pathways, id. ¶ 26; fraudulent billing for EKG services not provided, id. ¶ 27; and fraudulent billing for medication not provided, id ¶ 30. Finally, Relators allege that Defendants maintain a "computerized reporting system," the "Midas" system, that

"memorializes all patient billing complaints." Id. ¶ 22. According to Relators, Defendants' alleged fraudulent billing practices were "first made known to the Relators by patients reporting billing errors and complaints." Id.

## B. Procedural History

On July 11, 2011, Relators filed a sealed Complaint against Defendants. Complaint, ECF No. 1. On February 15, 2012, Relators filed their First Amended Complaint. First Am. Complaint, ECF No. 12. After lengthy proceedings while the Complaint remained under seal, on July 3, 2014, the Commonwealth of Virginia declined intervention in this matter. Notice, ECF No. 32. On July 28, 2014, the United States also declined intervention. Notice, ECF No. 33. Thus, on August 8, 2014, the Court ordered that the Complaint be unsealed and served upon Defendants. Ex Parte Order, ECF No. 34.

On January 9, 2015, Defendants filed the instant motion, seeking dismissal of the First Amended Complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Mot. to Dismiss, ECF No. 48. Defendants contend that Relators' asserted false-claims causes of action fail because: 1) Relators have failed to plead with particularity that the alleged false claims were actually presented to Government Payors; and 2) Relators have not pleaded sufficient allegations of scienter to state a claim under the FCA or VFATA. See Defs.' Mem. Supp.

Mot. to Dismiss at 12-14, ECF No. 49.   In addition, Defendants contest the sufficiency of Relators' allegations with respect to retaliation and false claims stemming from services provided by allegedly unqualified personnel.   Id. at 14-16.

On February 6, 2015, Relators filed their opposition to Defendants' motion to dismiss.   Relators' Opp'n to Mot. to Dismiss, ECF No. 52.   Relators concede that they have not adequately pleaded causes of action for retaliation or false claims based on billing Government Payors for services provided by unqualified personnel.   Id. at 2.   Relators request leave to amend such claims.   Id.   Regarding the sufficiency of their other claims, Relators argue that they have sufficiently alleged presentment to Government Payors through the "[d]etailed tables" included in the First Amended Complaint and the fact that it is "a practical certainty that some of these billings were submitted to the federal and state payors identified in the First Amended Complaint."   Id. at 8.   As to their scienter allegations, Relators contend that the allegations regarding the 2006 audit are sufficient to allow Relators' claims to survive Defendants' motion to dismiss.   See id. at 7-8.   Finally, in the event the Court dismisses any of Relators' claims, Relators request leave to amend the First Amended Complaint.   Id. at 8-10.

On February 12, 2015, Defendants filed their reply brief. Defs.' Rebuttal Mem. Supp. Mot. to Dismiss, ECF No. 53. In addition to reiterating the points presented in their brief in support of their motion, Defendants argue that the Court should deny Relators leave to amend their First Amended Complaint because any amendment would be futile and prejudicial to Defendants. Id. at 5.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint, or a claim within a complaint, based on the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (omission in original). The United States Supreme Court has interpreted the pleading standard set forth in Rule 8(a) as requiring that a complaint include enough facts for the claim to be "plausible on its face" and thereby "raise a right to relief above the speculative level on the assumption that all the allegations in

the complaint are true (even if doubtful in fact)." Id. at 555, 570 (internal citations omitted). The plausibility requirement is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility" that a defendant is liable. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556). In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 663.

Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" Kensington Volunteer Fire Dep't v. Montgomery County, 684 F.3d 462, 467 (4th Cir. 2012) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011)). Accordingly, "'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'" Twombly, 550 U.S. at 555 (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)) (omission in original). A complaint may therefore survive a motion to dismiss "even if it appears 'that a recovery is very remote and unlikely.'" Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

In addition to the general pleading standard set forth in Rule 8(a), Rule 9 of the Federal Rules of Civil Procedure establishes pleading requirements for "special matters." Fed. R. Civ. P. 9. Subsection (b) of Rule 9 addresses the pleading requirements for "fraud or mistake" and "conditions of mind" and provides that:

> (b) In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). A plaintiff's failure to plead fraud with particularity under Rule 9(b)'s pleading requirements "is treated as a failure to state a claim under Rule 12(b)(6)." Harrison v. Westinghouse Savanna River Co., 176 F.3d 776, 783 n.5 (4th Cir. 1999) (citation omitted).

FCA claims sound in fraud and, therefore, the Court of Appeals for the Fourth Circuit has "adhered firmly to the strictures of Rule 9(b) in applying its terms to cases brought under the Act." United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 456 (4th Cir. 2013) (citations omitted), cert. denied, 134 S. Ct. 1759 (2014). The Fourth Circuit has underscored that:

> The multiple purposes of Rule 9(b), namely, of providing notice to a defendant of its alleged misconduct, of preventing frivolous suits, of 'eliminat[ing] fraud actions in which all the facts are learned after discovery,' and of 'protect[ing]

defendants from harm to their goodwill and reputation,' are as applicable in cases brought under the Act as they are in other fraud cases.

Id. at 456 (internal citation omitted) (quoting Harrison, 176 F.3d at 784).

### III. DISCUSSION

#### A. The FCA and VFATA

Among other things, the FCA prohibits a person from knowingly submitting false claims for payment to the United States. Under the FCA, Congress has established that:

> any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1). In the FCA, Congress has defined the terms "knowingly" and "claim" as follows:

> (1) the terms "knowing" and "knowingly"—
>     (A) mean that a person, with respect to information--
>         (i) has actual knowledge of the information;
>         (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>         (iii) acts in reckless disregard of the truth or falsity of the information; and
>     (B) require no proof of specific intent to defraud;
>
> (2) the term "claim"—
>     (A) means any request or demand, whether under a contract or otherwise, for money or property and

whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property . . . .

Id. § 3729(b). Thus, "[a] false statement is actionable under the Act only if it constitutes a 'false or fraudulent claim.'" Nathan, 707 F.3d at 454 (emphasis in original) (quoting Harrison, 176 F.3d at 785). This is so because "'[t]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.'" Harrison, 176 F.3d at 785 (quoting United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995)). Therefore, "to trigger liability under the Act, a claim actually must have been submitted to the federal government for reimbursement, resulting in 'a call upon the government fisc.'" Nathan, 707 F.3d at 454 (quoting Harrison, 176 F.3d at 785) (citing Hopper v. Solvay

Pharm., Inc., 588 F.3d 1318, 1325-26 (11th Cir. 2009)). In short, the Fourth Circuit has distilled the elements of an FCA claim down to the following test: "To prove a false claim, a plaintiff must allege four elements: (1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter; (3) that is material; and (4) that results in a claim to the Government." United States v. Triple Canopy, Inc., 775 F.3d 628, 634 (4th Cir. 2015) (citation omitted).

As noted above, an FCA plaintiff must plead his claim with particularity under Rule 9(b). "To satisfy Rule 9(b), 'an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" United States ex rel. Ahumada v. NISH, 756 F.3d 268, 280 (4th Cir. 2014) (quoting United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). "More precisely, the complaint must allege 'the who, what, when, where and how of the alleged fraud.'" Id. (quoting Wilson, 525 F.3d at 379). Furthermore, in considering the interplay between the FCA and Rule 9(b), the Fourth Circuit has agreed with the Eleventh Circuit that:

> the particularity requirement of Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been

submitted, were likely submitted or should have been submitted to the Government."

Nathan, 707 F.3d at 456-57 (quoting United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002)). Instead, "Rule 9(b) requires that 'some indicia of reliability' must be provided in the complaint to support the allegation that an actual false claim was presented to the government." Id. at 457 (quoting Clausen, 290 F.3d at 1311). Therefore, "when a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment."[4]   Id. (emphasis in original). However, the Fourth

---

[4] The Court notes that the courts of appeals have divided on the level of detail that Rule 9(b) requires for a plaintiff to state an FCA claim. Compare, e.g., United States ex rel. Bledsoe v. Community Health Sys., Inc. 501 F.3d 493, 504 (6th Cir. 2007) (holding that "pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)"), with, e.g., United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (holding that a plaintiff need not allege a specific individual claim to satisfy Rule 9(b)). See generally Br. of the United States as Amicus Curiae, Nathan, 134 S. Ct. 1759 (2014) (No. 12-1349). Indeed, even panels of the same courts of appeals have inconsistently applied Rule 9(b). See Br. of the United States, supra, at 13-14. Despite this conflict of authority, the Fourth Circuit has expressly stated that "[t]o the extent that other cases apply a more relaxed construction of Rule 9(b) [than that construction set forth in Nathan] . . . we disagree with that approach." Nathan 707 F.3d at 457-58. Moreover, in Nathan, the United States Supreme Court declined to consider "whether Rule 9(b) requires that a complaint under the False Claims Act allege with particularity that specific false claims actually were presented to the government for payment . . . or whether it is instead sufficient to allege the

Circuit has suggested that, even in the absence of "particularized allegations of false claims," a plaintiff can satisfy Rule 9(b)'s strictures where the "specific allegations of the defendant's fraudulent conduct necessarily le[ad] to the plausible inference that false claims were presented to the government." Id.

Similar to the FCA, the VFATA prohibits a person from submitting a false or fraudulent claim to the Commonwealth of Virginia. More specifically, the General Assembly has established that:

> Any person who: 1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; . . . shall be liable to the Commonwealth for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages sustained by the Commonwealth.

Va. Code Ann. § 8.01-216.3(A)(1). In addition, the General Assembly has defined the terms "knowing" and "knowingly" to mean that "a person, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information and require no proof of specific intent to defraud." Id. §

---

particular details of the scheme together with sufficient indicia that false claims were submitted." Pet. for Writ of Cert. at i, Nathan, 134 S. Ct. 1759. Therefore, notwithstanding contrary authority from other courts of appeals, the Court must apply the law governing the FCA and Rule 9(b) as established by the Fourth Circuit.

8.01-216.3(C). Furthermore, a "claim" is defined, in pertinent part, as:

> any request or demand, whether under a contract or otherwise, for money or property, regardless of whether the Commonwealth has title to the money or property, that (i) is presented to an officer, employee, or agent of the Commonwealth or (ii) is made to a contractor, grantee, or other recipient (a) if the money or property is to be spent or used on the Commonwealth's behalf or to advance a governmental program or interest and (b) if the Commonwealth provides or has provided any portion of the money or property requested or demanded or will reimburse such contractor, grantee, or other recipient for any portion of the money or property that is requested or demanded.

Id. § 8.01-216.2. As a claim sounding in fraud, a plaintiff must plead a VFATA claim with particularity under Rule 9(b). See Virginia ex rel. Hunter Labs., LLC v. Quest Diagnostics, Inc., Civil Action No. 1:13cv1129, 2014 WL 1928211, at *7-8 (E.D. Va. May 13, 2014) (Lee, J.) (dismissing a VFATA claim for failure to plead fraud with particularity under Rule 9(b)).

## B. The Sufficiency of Relators' Presentment Allegations

The Court must now consider whether Relators have pleaded sufficient factual matter to satisfy the particularity requirement of Rule 9(b) with respect to their FCA and VFATA claims. Relators concede that they have not satisfied such requirements for their retaliation and billing-for-unqualified-personnel claims, Relators' Opp'n to Mot. to Dismiss at 2, and,

therefore, the Court will **GRANT** Defendants' motion as to those claims.

Regarding the remaining claims, as in Nathan, the "critical question" is whether Relators have plausibly alleged that Defendants "caused a false claim to be presented to the government" under the theories of liability set forth in the First Amended Complaint. 707 F.3d at 456. In this case, Relators have not alleged with particularity that specific false claims actually were presented to Government Payors for payment. To be sure, the First Amended Complaint includes particularized allegations that Defendants overbilled specific individuals for certain services; Relators have alleged that Defendants overbilled specific individuals for intubations, First Am. Compl. ¶ 24, tracheostomies, id. ¶ 25, the medication Versed, id. ¶ 29, and E/M services, id. ¶ 33. However, Relators have not specifically alleged that Defendants presented claims for payment to Government Payors in connection with any of the individual claims enumerated in the First Amended Complaint. In fact, Relators have conceded that they "did not identify the specific type of payor and/or insurance associated with each specific claim identified." Relators' Opp'n to Mot. to Dismiss at 8. Accordingly, given that Relators have not alleged "with particularity that specific false claims actually were presented to the government for payment," the sufficiency of Relators'

23

presentment allegations turns on whether the "specific allegations of [Defendants'] fraudulent conduct necessarily le[ad] to the plausible inference that false claims were presented to the government." Nathan, 707 F.3d at 457-58. The Court will assess, in turn, the sufficiency of Relators' claims based on their level of detail.

### 1. EKGs

To begin, Relators' FCA claim based on Defendants' billing practices for EKGs falls well short of Rule 9(b)'s requirement that Relators plead presentment with particularity. Other than their conclusory allegations that Defendants "charged for EKGs when none were received," performed and billed for EKGs that were not ordered by a physician, and "frequently double bill[ed] for valid, properly ordered EKGs," First Am. Compl. ¶ 27, Relators present no allegations that allow the Court to reasonably infer that such practices resulted in Defendants actually presenting any fraudulent claim to Government Payors. Relators broadly assert that "[a]t least 20-30% of [Defendants'] patient base was served by [Government Payors]." Id. at 8 n.3. However, the Court cannot reasonably infer, based on such bare-bones, conclusory allegations, that Defendants engaged in a fraudulent scheme to overbill for EKGs, much less a scheme that "necessarily" led to the submission of false claims to the Government. Nathan, 707 F.3d at 458. From the mere fact that

Government Payors cover a certain percentage of Defendants'
patient base, it does not necessarily follow that Defendants
fraudulently billed Government Payors for EKG services with
respect to such patients. Cf. id. at 459 (finding that it was
an "implausible inference" to infer, from an allegation of the
"general statistics," that 93 percent of the sales of Kapidex, a
prescription drug, were for dosages of 60 mg, that any of the 98
prescriptions for Kapidex identified in the complaint were for
60 mg dosages). None of Relators' allegations permit the Court
to reasonably infer that the extent of Defendants' alleged
fraudulent billing for EKG services is proportional to or
coextensive with the percentage of Defendants' patient base
covered by Government Payors. In addition, Relators have not
alleged facts to plausibly establish that Defendants' general
scheme of overcharging patients for EKGs resulted in Defendants'
overbilling Government Payors for EKGs. Thus, the Court cannot
reasonably infer that Defendants' allegedly fraudulent EKG-
billing practices caused Defendants to present any claims to
Government Payors because Relators have not connected such
practices to the submission of any claims to Government Payors.
Therefore, the Court will **GRANT** Defendants' motion as to
Relators' claim that Defendants presented false claims to
Government Payors in billing for EKGs.[5]

_____

[5] In their briefing on the sufficiency of the First Amended

**2. Tracheostomies, E/M Services – Oral Medications, E/M Services – "à la Carte" Points, E/M Services – Patient Not Actually Seen**

Relators' allegations with respect to Defendants' billing practices for tracheostomies, E/M services for administering oral medications, E/M services for critical care patients, and E/M services for patients not actually seen by physicians provide an added level of detail beyond Relators' conclusory EKG-billing allegations because Relators identify specific individuals whom Defendants allegedly overbilled. Nevertheless, such added details do not sufficiently establish that the alleged fraudulent scheme "necessarily" led to the submission of false claims to Government Payors.

Like Relators' EKG claims, Relators allege in conclusory fashion that Defendants engaged in fraudulent billing practices for tracheostomies, E/M services for administering oral medications, E/M services for critical care patients, and E/M

---

Complaint, the parties did not distinguish between Relators' FCA and VFATA claims. Thus, they appear to agree that such claims rise or fall together. At least one court within this District has considered FCA and VFATA causes of action as analogous. United States ex rel. Rector v. Bon Secours Richmond Health Corp., Civil Action No. 3:11-cv-38, 2014 WL 1493568, at *14 (E.D. Va. Apr. 14, 2014) (holding that "[b]ecause the VFATA and FCA are analogous and Relator incorporates all of his arguments into both causes of action, Relator's VFATA claims will be dismissed for the very same reasons that his FCA claims fail."); see also Hunter Labs., 2014 WL 1928211, at *7-8 (applying the Nathan standard to assess the sufficiency of a VFATA claim). Given the similarity between the language in the FCA and VFATA and the parties' failure to distinguish between Relators' asserted causes of action under each statute, the Court will apply the same standard in assessing the pleading of Relators' alleged FCA and VFATA causes of action.

services for patients not actually seen by physicians. More specifically, Relators allege that Defendants: sometimes billed for an intubation using an internal code for a more expensive procedure, a tracheostomy, First Am. Compl. ¶ 25; overbilled for E/M services by assigning a point value for the administration of oral medications in excess of the actual acuity level of such services, id. ¶ 33; overbilled for E/M services by charging "à la carte" points to critical care patients when such points should not have been applied, id.; and overbilled for E/M services by sometimes charging a patient with an acuity level as if he had been seen by a physician, when no physician actually had performed E/M services for such patient, id. Without more, those conclusory allegations—like Relators' EKG-billing allegations—are insufficient to allow the Court to reasonably infer that Defendants presented any false claims to Government Payors as a result of such allegedly fraudulent billing practices. The Court cannot reasonably extrapolate from the fact that Defendants engaged in fraudulent billing practices that they did so with respect to Government Payors simply because Government Payors cover twenty to thirty percent of Defendants' client base. See supra Part III.B.1.

However, unlike Relators' EKG claims, the First Amended Complaint also includes allegations detailing specific fraudulent charges for tracheostomies and E/M services. As

noted above, Relators have alleged seventeen specific allegedly fraudulent tracheostomy charges, First Am. Compl. ¶ 25, and fifty-seven specific allegedly fraudulent E/M charges, id. ¶ 33. Admittedly, Relators' allegations involving such specific fraudulent charges are sufficient for the Court to reasonably infer that Defendants engaged in a scheme of fraudulent billing practices for tracheostomies and E/M services. However, to state an FCA claim, it is not enough for Relators simply to present allegations of a fraudulent scheme through which Defendants defrauded, or submitted illegal payment requests to, certain persons. See Nathan, 707 F.3d at 456-57. Rather, Relators must allege facts permitting a reasonable inference that Defendants' alleged fraudulent scheme resulted in Defendants presenting a false claim to Government Payors, not merely persons in general. See id. at 456-58.

Here, even though Relators' examples of specific allegedly fraudulent charges for tracheostomies, E/M services for administration of oral medication, E/M services for critical care patients, and E/M services for patients not actually seen by a physician, permit the Court to reasonably infer that Defendants engaged in a fraudulent scheme, they do not "necessarily lead to the plausible inference" that false claims were presented to the Government because of such scheme. Id. at 457. The court's decision in another case in this District

subsequent to the Fourth Circuit's decision in Nathan, United States ex rel. Rector v. Bon Secours Richmond Health Corp., is instructive as to why Relators' specific examples do not satisfy Rule 9(b).   Civil Action No. 3:11cv38, 2014 WL 1493568 (E.D. Va. Apr. 14, 2014) (Spencer, J.).

In Rector, the court found that a very detailed spreadsheet of alleged false claims was not sufficient to satisfy Rule 9(b)'s heightened pleading requirements because such spreadsheet did not permit the court to reasonably infer that the defendants necessarily billed the Government for the procedures.   The Rector relator alleged that the defendants had submitted false claims to the United States by billing Medicare and Medicaid based on "unsubstantiated or unsupported medical diagnoses." Id. at *3.   More specifically, inter alia, staff from the defendants' "concierge program," pursuant to instructions in the defendants' manuals, selected codes for procedures "to ensure that patient procedures or administered tests were coverable by relevant third-party payers or insurance programs."   Id. at *1. Allegedly, defendants instructed their concierge program staff to change codes for procedures that third-party payors did not cover to codes for procedures that such payors would cover.   Id. To support his allegation, the relator—a former employee in the defendants' concierge program—included a patient log of procedures for which the defendants allegedly submitted false

claims. Id. at *8. The log included: "patient names and social security numbers, types of procedures scheduled, scheduled dates of procedures, actual dates and times of procedures, facilities in which procedures were completed, the names of referring physician[s] and their practices, and the insurance of the patients." Id. However, despite the detail in the patient log, the Rector court concluded that the relator had failed to plead with particularity the presentment element of an FCA claim. Even though the patient log indicated that some of the patients were covered by Medicare, Medicaid, or TriCare, the Court found that such allegations were insufficient to satisfy the requirements of Rule 9(b). See id. at *8-9. The Court concluded that it could not necessarily infer from the patient log that the procedures took place "or that the Government was billed by [the defendants]." Id. at *9. The Court underscored that the relator's claim "[did] not involve an integrated scheme in which presentment of a claim for payment was a necessary result because the patients could have paid for the relevant prescriptions and procedures themselves." In short, the Court found that "Relator [was] missing the final link in the chain of causation." Id. at *9.

In this case, like the relator in Rector, Relators have failed to plead sufficient factual matter to allow the Court to plausibly infer that Defendants presented to Government Payors

any of the claims enumerated in the First Amended Complaint based on tracheostomies, or E/M Services in connection with oral medications, "à la carte" points for critical care patients, or patients not actually seen. As in Rector, the Court cannot reasonably infer from Relators' listing of alleged fraudulent claims that Defendants actually submitted any such claim to Government Payors because the mere existence of specific individual fraudulent claims does not necessarily indicate that Defendants submitted such claims to Government Payors. See id. at *8-9; cf. Nathan, 707 F.3d at 459 (finding that general statistics did not allow the plausible inference that any of the 98 prescriptions identified in the complaint were for off-label uses). Indeed, Relators' allegations here are even more tenuous than those rejected in Rector—a patient log that identified certain patients as covered by Medicare, Medicaid, and TriCare—because Relators have not even alleged that Government Payors covered any of the specific patients enumerated in the First Amended Complaint. See id. at *8-9.[6] To the contrary, Relators concede that they "did not identify the specific type of payor and or insurance associated with each specific claim identified." Relators' Opp'n to Mot. to Dismiss at 8.

---

[6] As discussed supra Part III.B.1, Relators' broad allegation that twenty to thirty percent of Defendants' patients are covered by Government Payors does not satisfy Rule 9(b)'s requirement that Defendant plead with particularity that Defendants presented a false claim to Government Payors.

Therefore, in this case, not only is it possible, as in Rector, that the patients identified could have paid for the specified procedures themselves, third party private insurers also could have paid for the specified procedures. Accordingly, the Court finds that Relators have failed to allege facts that permit the Court to reasonably infer that any of the specified claims based on tracheostomies, E/M services for administering oral medications, the assignment of "à la carte" points for E/M services for critical care patients, or E/M services billed for patients not actually seen by physicians, actually resulted in Defendants presenting false claims for payment to Government Payors. Therefore, the Court will **GRANT** Defendants' motion with respect to such claims.

### 3. Medication Pathways

Next, the Court will consider the sufficiency of Relators' allegations with respect to fraudulent billing for medication pathways. Regarding medication pathways, Relators allege that Defendants' IBEX billing system automatically billed for medication routes or pathways regardless whether CMS regulations permitted billing for the delivery of the medication involved. First Am. Compl. ¶ 26. Thus, Relators allege, "[t]his resulted in impermissible double charges being levied for 'routes,'" and such "charges were made routinely and systematically over the course of several years." Id.

32

Relators' medication-pathways allegations do not satisfy the heightened pleading standard of Rule 9(b). Such allegations provide an added level of detail compared with Relators' allegations discussed above because Relators describe a systematic mechanism by which the Defendants allegedly levied double charges for medication pathways. The allegation that such double charges resulted from the Defendants' IBEX billing system "automatically" billing for medication routes or pathways, if true, suggests that the IBEX program systematically overcharged for all medication pathways. Therefore, given the allegedly automatic nature of the errors in the IBEX system, the Court arguably might infer from such allegations that Defendants would have overcharged any patient covered by a Government Payor for whom Defendants administered a single medication.[7]

However, such allegations do not satisfy the particularity requirement of Rule 9(b) because they do not permit the Court to plausibly infer that the answer to the "critical question"—"whether the defendant[s] caused a false claim to be presented to the government"—is yes. See Nathan, 707 F.3d at 456.

---

[7] The Court notes that, even if the Court can infer that the IBEX system automatically overcharged for all medication pathways, the Court cannot plausibly infer, from only the general statistics that Government Payors covered twenty to thirty percent of Defendants' patients, that Defendants submitted any excessive medication-pathways charges to Government Payors. See supra n.6. It is an implausible inference to extrapolate from the makeup of Defendants' patient base that Defendants provided medication-pathways services to patients covered by Government Payors in proportion to such makeup.

Although Relators must allege the "who, what, when, where, and how of the alleged fraud," Wilson, 525 F.3d at 379 (citations and internal quotation marks omitted), Relators' medication-pathways allegations do not allow the Court to plausibly infer the "when" or the "how" of the alleged false claims. Other than the general allegation that such alleged fraud occurred over "several years," First Am. Compl. ¶ 26, the First Amended Complaint lacks specific allegations of when any false claims were submitted to Government Payors. Furthermore, while Relators detail an intricate scheme by which Defendants used the IBEX system to double-bill for medication pathways, critically, Defendants have failed to plead facts to establish the connection between the IBEX system and the submission of false claims to Government Payors. In other words, Relators have alleged how Defendants fraudulently used the IBEX system to charge for medication pathways, but have not alleged how such conduct led to the submission of any bills to Government Payors. Therefore, under Nathan, Relators' medication-pathways allegations do not meet Rule 9(b)'s heightened pleading standard because they do not establish that Defendants' alleged "fraudulent conduct necessarily le[ads] to the plausible inference that false claims were presented to [Government Payors]." 707 F.3d at 456.[8]

---

[8] See also United States v. Kernan Hosp., 880 F. Supp. 2d 676,

Importantly, even if the IBEX system errors led Defendants to automatically overcharge for medication pathways, the Court finds that such automaticity allegation does not provide sufficient indicia of reliability to support Relators' conclusory allegation that Defendants submitted false claims to Government Payors.   In Nathan, the Fourth Circuit cited United States ex rel. Grubbs v. Kanneganti with approval as an example of a case in which "specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were presented to the government." The Nathan court summarized Grubbs as follows:

> the relator alleged a conspiracy by doctors to seek reimbursement from governmental health programs for services that never were performed. The court concluded that, because the complaint included the dates of specific services that were recorded by the physicians but never were provided, such allegations constituted "more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government." Accordingly, the court further concluded that it would "stretch the imagination" for the

687 (D. Md. 2012) (holding that, despite allegations of a detailed scheme of upcoding for malnutrition diagnoses, the Government failed to plead an FCA claim with particularity because the complaint did not include the "next step or link in the False Claims Act liability mechanism—namely, that these fraudulent diagnoses made their way to cost reports submitted to the [Government] and actually caused the [Government] to pay [the defendant] for services not rendered."); cf. Rector, 2014 WL 1493568, at *1-3, *9 (holding, in a case in which the complaint included detailed allegations of a fraudulent scheme to bill for claims based on unsubstantiated or unsupported medical diagnoses, that allegations that certain specific procedures took place were "not enough to plausibly allege that . . . the government was billed by [the defendant]."

doctors to continually record services that were not provided, but "to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed."

Nathan, 707 F.3d 457 (internal citations omitted) (quoting United States ex rel. Grubbs, 565 F.3d 180, 192 (5th Cir. 2009)). Here, the indicia of reliability present in Grubbs are lacking. In Grubbs, in the operative complaint, the relator alleged specific instances in which medical records from specific dates indicated that physicians had not performed services, but had billed Medicaid anyway. Second Amended Complaint, Civil Action No. 1:05cv-323, ECF No. 131 (E.D. Tex. Jan. 31, 2007). Thus, given the express allegations that the defendants documented, in medical records, services that they did not perform, and then billed Medicaid therefor, it is not surprising that the Fifth Circuit found that it would "stretch the imagination" for the defendants "to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." Grubbs, 565 F.3d at 192. In this case, while errors in the IBEX system may have led such system to automatically overcharge for medication pathways, the automaticity of the IBEX program errors is not "circumstantial evidence that [such errors] caused [Defendants'] billing system in due course to present fraudulent claims to the Government," because, unlike Grubbs, Relators have not alleged

that Defendants ever submitted to Government Payors any specific excessive bills for medication pathways as a result of the IBEX errors. See Grubbs, 565 F.3d at 192. Therefore, in contrast with Grubbs, Relators' allegations do not establish that the alleged IBEX system errors "necessarily le[ad] to the plausible inference that [Defendants] submitted false claims to [Government Payors]." Nathan, 707 F.3d at 458. Accordingly, the Court will **GRANT** Defendants' motion as to Relators' medication-pathways claims.

### 4. Intubation, Medication, E/M Services – Double Charging

Finally, regarding the sufficiency of Relators' allegations, the Court will assess whether Relators have pleaded with particularity the presentment of any false claims based on double and triple charges for intubations, double and triple charges for medications, such as Versed, and double charges for E/M services. Relators allege that systemic flaws in Defendants' IBEX billing system resulted in excessive charges for intubations, medications, including Versed, and E/M services. See First Am. Compl. ¶¶ 24, 29, 33. In support of such allegations, Relators have alleged, respectively, 105, 22, and 57 specific excessive charges. See id. Thus, Relators' most detailed allegations in the First Amended Complaint concern charges for intubations, medications, and E/M services because Relators have alleged both the manner in which Defendants

37

automatically overcharged for procedures—through the systemic errors in the IBEX system—and specific instances of such conduct. Such allegations combine the level of detail in Relators' previously discussed tracheostomy and E/M-services claims—specific instances of overcharging—with the level of detail in Relators' previously discussed medication-pathways allegations—a description of an automatic mechanism by which Defendants allegedly overcharged for procedures. Nonetheless, as with Relators' other claims, such allegations fall short of the heightened pleading standard of Rule 9(b).

Relators have failed to plead facts from which the Court can plausibly infer that Defendants actually presented to Government Payors false claims for intubations, medications, or E/M services. As discussed above, neither the automaticity of the mechanism by which Defendants allegedly overcharged for intubations, medications, and E/M services, see supra Part III.B.3 & n.7, nor the specific instances of fraudulent charges, see supra Part III.B.2, alone, allow the Court to reasonably infer that Defendants submitted any false claims to Government Payors. Moreover, combining such independently-insufficient allegations does not cure their deficiencies. To be sure, Relators' allegations that errors in the IBEX system led to widespread overcharging for intubations, medications, and E/M services, in conjunction with their allegations of numerous

specific instances of such fraudulent charges, if true and assuming Defendants possessed the requisite knowledge of such overcharging, easily establish beyond the speculative level that Defendants engaged in a fraudulent scheme. But, as noted earlier, FCA false-claim liability hinges not on the existence of a fraudulent scheme, but on "whether [Defendants] caused a false claim to be presented to [Government Payors]." Nathan, 707 F.3d at 456. As with their earlier claims, Relators have failed to plead facts to establish that the IBEX system errors necessarily led to the presentment of false claims to the Government. Although the Court might reasonably infer that IBEX program errors automatically led to overcharging for certain procedures, Relators have not connected such overcharging to the submission of bills containing excessive charges to Government Payors. See supra Part III.B.3. Likewise, Relators have failed to plead facts linking the excessive charges for the specific procedures listed in the First Amended Complaint to the presentment of any such charges to Government Payors. For the Court to find that Relators adequately had pleaded presentment of the remaining claims, the Court would have to infer based solely on the general makeup of Defendants' patient base that Defendants' alleged fraudulent scheme resulted both in Defendants overcharging persons covered by Government Payors and Defendants then billing Government Payors for such charges. In

light of the heightened pleading standard that Rule 9(b) imposes
and the Fourth Circuit's decision in Nathan, such an inference
is not reasonable.[9]   Therefore, the Court will **GRANT** Defendants'
motion as to Relators' claims that Defendants submitted false
claims to Government Payors by overcharging for intubations,
medication, and E/M services.[10]

### C. Leave to Amend

In light of the Court's conclusion that Relators have
failed to plead with particularity the presentment element of an
FCA or VFATA claim, the Court must now consider whether to grant

---

[9] The Court finds unpersuasive the out-of-circuit authority
relied on by Relators. As an initial matter, the inter- and,
apparently, intra-circuit split regarding the level of pleading that
Rule 9(b) requires for FCA claims, see supra n.4, lessens the
persuasiveness of out-of-circuit authority on such issue. Relators
rely on the Eighth Circuit's decision in United States ex rel. Thayer
v. Planned Parenthood of the Heartland, for the proposition that a
relator's personal knowledge of a defendant's billing practices
provides sufficient indicia of reliability to establish a plausible
inference that the defendant actually submitted false claims to the
Government. See Relators' Opp'n to Mot. to Dismiss at 7 (quoting
Thayer, 765 F.3d 914, 918-19 (8th Cir. 2014)). However, in Nathan,
the relator, as one of the defendant's sales managers, likely had
detailed knowledge of the fraudulent scheme allegedly perpetrated by
the defendant, yet, the Fourth Circuit concluded that his allegations
failed under Rule 9(b). Moreover, in Rector, another court within
this District found that a relator could not cure his failure to
plausibly allege that the defendants actually submitted false claims
to the Government "by asserting any firsthand knowledge of the billing
processes of any [defendant]." 2014 WL 1493568, at *8 (citing United
States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1358-59 (11th Cir.
2006). Therefore, Thayer does not alter this Court's conclusion with
respect to Relators' FCA or VFATA claims.

[10] Having concluded that Relators have failed to adequately plead
presentment, the Court need not consider Defendants' alternative
argument that Relators have failed to plead the scienter element of an
FCA cause of action.

Relators leave to amend their First Amended Complaint to attempt to cure the deficiencies therein. Under Federal Rule of Civil Procedure 15(a):

> (1) A party may amend its pleading once as a matter of course within:(A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
> (2) In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires. . . .

Fed. R. Civ. P. 15(a)(1)-(2). In this case, Relators have not filed an amended pleading within twenty-one days after Defendants' Rule 12(b)(6) motion. Thus, Relators may only amend their First Amended Complaint with the Court's leave. See id.

The text of Federal Rule of Civil Procedure 15(a)(2) requires that the Court "freely give leave [to amend] when justice so requires." Id. "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (citations omitted). After a dismissal under Federal Rule of Civil Procedure 12(b)(6), a court "normally will give plaintiff leave to file an amended complaint" because "[t]he federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff

41

be given every opportunity to cure a formal defect in his pleading." Ostrzenski v. Seigel, 177 F.3d 245, 252-53 (4th Cir. 1999) (emphasis omitted). Likewise, "[t]ypically, '[f]ailure to plead fraud with particularity . . . does not support a dismissal with prejudice. To the contrary, leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud." Rector, 2014 WL 1493568, at *14 (second alteration in original) (quoting Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). However, "a district court may deny leave to amend if the amendment 'would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" Nathan, 707 F.3d at 461 (4th Cir. 2013) (quoting Laber, 438 F.3d at 426)). "'[A]n amendment may be considered futile where [the plaintiff] ha[s] previously had two full opportunities to plead [his] claim.'" Hunter Labs., 2014 WL 1928211, at *11 (quoting Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 595 (E.D. Va. 2006)). But, "[d]elay alone . . . is an insufficient reason to deny [a] plaintiff's motion to amend." Laber, 438 F.3d at 427 (citation omitted).

The Court will dismiss the First Amended Complaint without prejudice, but will grant Relators leave to amend such complaint. First, there is no evidence of bad faith on the part of Relators. Second, although Defendants assert that leave to

42

amend would prejudice them because "if this case is permitted to drag out even longer, . . . trial will inevitably involve evidence of events from more than a decade ago," Defs.' Rebuttal Mem. Supp. Mot. to Dismiss at 5, Defendants have not identified any evidence in particular that is in danger of being lost if the Court provides Relators with an additional opportunity to plead their claims. Moreover, Relators' delay in seeking leave to amend, alone, is not a sufficient reason for the Court to deny leave to amend. Laber, 438 F.3d at 427. Third, at this stage, the Court cannot conclude that an amendment would be futile. While the Court recognizes that Relators have had two opportunities to plead their claims, this is not a case in which Relators had notice of any deficiencies in the First Amended Complaint prior to the resolution of the instant motion. Cf. Hunter Labs., 2014 WL 1928211, at *11 (dismissing a VFATA claim with prejudice because the court's prior ruling granting a motion to dismiss provided the relator with notice of deficiencies in the complaint). Thus, it is possible that Relators may be able to allege sufficient additional facts to satisfy Rule 9(b)'s heightened pleading standard. Accordingly, the Court will **DENY IN PART** Defendants' motion to the extent they sought dismissal of the First Amended Complaint with prejudice.

43

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss, ECF No. 48. The Court **DISMISSES WITHOUT PREJUDICE** Relators' First Amended Complaint, ECF No. 12. However, the Court **PROVIDES** Relators with leave to amend the First Amended Complaint to cure all defects within twenty-one (21) days after the entry of this Opinion and Order. If Relators fail to adequately amend the First Amended Complaint within the period prescribed, the Court will dismiss such complaint with prejudice.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ Mark S. Davis

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March 23 , 2015